Richard A. Clark (State Bar No. 39558)
(rclark@pmcos.com)
Brent G. Cheney (State Bar No. 180429)
(bcheney@pmcos.com)
PARKER MILLIKEN CLARK O'HARA
  & SAMUELIAN, P.C.
555 South Flower Street, 30th Floor
Los Angeles, CA 90071-2440
Telephone: 213-683-6500
Facsimile: 213-683-6669

James A. O'Neal (*pro hac vice* motion pending)
(James.Oneal@FaegreBD.com)
Amy R. Fiterman (*pro hac vice* motion pending)
(Amy.Fiterman@FaegreBD.com)
Christine R.M. Kain (*pro hac vice* motion pending)
(Christine.Kain@FaegreBD.com)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

James M. Sullivan (admitted *pro hac vice*)
(jsullivan@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Attorneys for Defendant NOVARTIS
PHARMACEUTICALS CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBORAH STANLEY, | **C.V. NO.: 2:11-cv-03191-JGB-OP** |
| Plaintiff, | **DEFENDANT NOVARTIS PHARMACEUTICALS CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| NOVARTIS PHARMACEUTICALS CORPORATION, | |
| Defendant. | Hearing Date: December 16, 2013 Time: 10:00 a.m. Judge: Hon. Jesus G. Bernal Courtroom: 1 |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................... 1

II.  STATEMENT OF UNCONTROVERTED FACTS ........................................... 2

    A.  Aredia® and Zometa® ............................................................ 2

    B.  Osteonecrosis of the Jaw and Subsequent Changes to Aredia®
        and Zometa® Package Inserts ................................................... 3

    C.  Plaintiff's Medical and Dental History, Including
        Bisphosphonate Therapy ......................................................... 4

    D.  Generic Pamidronate ............................................................ 7

III.  SUMMARY JUDGMENT STANDARD ..................................................... 8

IV.  ARGUMENT ......................................................................... 9

    A.  NPC Is Entitled To Summary Judgment On All Claims. .................... 9

        1.  Plaintiff cannot satisfy her proximate cause burden of
            proof regarding her exposure to Aredia® and Zometa® .............. 9

        2.  Plaintiff cannot prevail by focusing on the tooth
            extractions that occurred in the summer of 2009. ................... 12

        3.  Plaintiff's claims fail because she has no admissible
            evidence to prove specific medical causation. ....................... 13

        4.  Plaintiff's design defect claim fails as a matter of law ............ 14

        5.  Plaintiff's breach of implied warranty claim fails as a
            matter of law. ........................................................ 15

    B.  If The Court Does Not Grant Summary Judgment On All
        Claims, The Court Should Preclude Plaintiff From Seeking To
        Hold NPC Liable For Certain Pamidronate Infusions That She
        Cannot Prove Were Aredia®, As Opposed To Generic
        Pamidronate. ....................................................... 16

C.     If The Court Does Not Grant Summary Judgment On All
       Claims, The Court Should Apply New Jersey Law To Plaintiff's
       Punitive Damages Demand And Preclude Her From Seeking
       Punitive Damages At Trial.................................................................. 17

       1.     California and New Jersey law conflict regarding punitive
              damages. ...................................................................................... 17

       2.     New Jersey has a greater interest than California in
              having its punitive damages law applied in this case.............. 20

       3.     If New Jersey punitive damages law applies here, then
              plaintiff's punitive damages demand is barred by
              preemption principles. ............................................................. 23

V.     CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. I-Flow Corp.*, No. CV09-09550 R(SSx),
2010 WL 1339948 (C.D. Cal. Mar. 30, 2010)........................................15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986) ...................8

*Artiglio v. Superior Court*, 22 Cal. App. 4th 1388 (1994) ........................................14

*Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 131 S. Ct. 1342 (2011)........................25

*Bank Saderat Iran v. Telegen Corp.*, 30 F. App'x 741 (9th Cir. 2002) ...................18

*Bessemer v. NPC*, No. MID-L-1835-08, 2010 WL 6257855
(N.J. Super. Ct., Law Div. Apr. 30, 2010)............................................24

*Blanco v. Baxter Healthcare Corp.*, 158 Cal. App. 4th 1039 (2008).......................15

*Brown v. NPC*, No. 7:08-cv-00130-FL,
2012 WL 3066588 (E.D.N.C. July 27, 2012)……………………………….21, 24

*Brown v. Superior Court*, 44 Cal. 3d 1049, 1072 (1988) .........................................14

*Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341,
1215 S.Ct. 1012 (2001).................................................................24, 25

*Carlin v. Superior Court*, 13 Cal. 4th 1104 (1996) ....................................................9

*Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380 (N.D. Cal. 1995) ....................13, 14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986)................................8

*Chandler v. Chiron Corp.*, No. C-96-1047 SI, 1997 WL 464827
(N.D. Cal. July 28, 1997)...................................................................15

*Cornett v. Johnson & Johnson*, 998 A.2d 543
(N.J. Super. Ct. App. Div. 2010) ......................................................24

*D'Agnese v. NPC*, No. CV-12-00749, --- F. Supp. 2d ---,
2013 WL 3335203 (D. Ariz. July 2, 2013)........................................10

*Deutsch v. NPC*, 723 F. Supp. 2d 521 (E.D.N.Y. 2010) ....................................21, 22

*Dopson-Troutt v. NPC*, No. 8:06-CV-1708-T-24-EAJ,
2013 WL 3808205 (M.D. Fla. July 22, 2013) ...............................21, 24

*Eberhart v. NPC*, 867 F. Supp. 2d 1241 (N.D. Ga. 2011) .......................................10

*Evraets v. Intermedics Intraocular, Inc.*, 29 Cal. App. 4th 779 (1994) ...................15

*Franklin Supply Co. v. Tolman*, 454 F.2d 1059 (9th Cir. 1971) .......................18, 21

*Georges v. NPC*, No. CV 06-5207 SJO (VBKx),
  2012 WL 9083365 (C.D. Cal. Nov. 2, 2012) ................................................ 10, 11

*Guenther v. NPC*, No. 6:08-cv-00456-Orl-31DAB,
  2013 WL 1225391 (M.D. Fla. Mar. 27, 2013) .............................................. 21, 24

*Hernandez v. Aeronaves De Mexico, S.A.*, 583 F. Supp. 331
  (N.D. Cal. 1984) ......................................................................................... 18, 21

*Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107 (9th Cir. 2003) .................... 8, 11

*Hill v. NPC*, No. 1:06-cv-00939-AWI-DLD, 2012 WL 967577
  (E.D. Cal. Mar. 21, 2012) ........................................................................... 22, 23

*In re Air Crash Disaster Near Chi., Ill. on May 25, 1979*, 644 F.2d 594
  (7th Cir. 1981) .................................................................................................... 21

*In re Aredia and Zometa Prods. Liab. Litig*, No. 3:06-MD-1760,
  2007 WL 4387376 (M.D. Tenn. Nov. 30, 2007) .......................................... 17, 25

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
  318 F. Supp. 2d 879 (C.D. Cal. 2004) ........................................................ 13, 14

*Ingram v. NPC*, 888 F. Supp. 2d 1241 (W.D. Okla. 2012) ............................... 10, 11

*Irby v. NPC*, No. MID-L-1815-08 MT 278, 2011 WL 5835414
  (N.J. Super. Ct. Nov. 18, 2011) .......................................................................... 21

*Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396 (1985) ............................. 11, 13

*Kennedy v. Baxter Healthcare Corp.*, 43 Cal. App. 4th 799 (1996) ........................ 15

*Kilpatrick v. Breg, Inc.*, 613 F.3d 1329 (11th Cir. 2010) ........................................ 14

*Kobar ex rel. Kobar v. Novartis Corp.*, 378 F. Supp. 2d 1166
  (D. Ariz. 2005) ............................................................................................... 24-25

*Krause v. NPC*, 926 F. Supp. 2d 1306 (N.D. Fla. 2013) ..................................... 21, 22

*Love v. Associated Papers, Ltd.*, 611 F.3d 601 (9th Cir. 2010) .............................. 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
  106 S.Ct. 1348 (1986) .................................................................................... 8, 11

*McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68 (2010) .................................... 18, 20

*McCarty v. Johnson & Johnson*, No. 1:10-CV-00350,
  2010 WL 2629913 (E.D. Cal. June 29, 2010) ...................................................... 15

*McDarby v. Merck & Co.*, 949 A.2d 223 (N.J. Super. Ct. App. Div. 2008),
  *appeal dismissed as improvidently granted*, 979 A.2d 766 (2009) ...................... 24

*McNall v. Tatham*, 676 F. Supp. 987 (C.D. Cal. 1987) ............................................ 21

*Meng v. NPC*, Nos. L7670-07MT, L-6072-08MT, 2009 WL 4623715
(N.J. Super. Ct. Law Div. Nov. 23, 2009) .......................................21, 24

*Messick v. NPC*, 924 F. Supp. 2d 1099 (N.D. Cal. 2013) ................. 13, 14

*Morton v. Centerpulse Orthopedics, Inc.*, No. CIV S032602GEBGGH,
2005 WL 1366494 (E.D. Cal. May 10, 2005) ...................................... 15

*Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984 (C.D. Cal. 2001)
*aff'd* 358 F.3d 659 (9th Cir. 2004) ..................................................9, 13

*Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013) ................... 14, 15

*Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199 (9th Cir. 2002)...................24

*Nix v. SmithKline Beecham Corp.*, No. CV-06-43, 2007 WL 2526402
(D. Ariz. Sept. 5, 2007)............................................................................9

*O'Neill v. Crane*, 53 Cal 4th 335 (2012) ............................................ 16

*Patterson v. NPC*, 451 F. App'x 495 (6th Cir. 2011)..................................1

*Payne v. NPC*, No. 1:12-CV-77, --- F. Supp. 2d ---,
2013 WL 4779571 (E.D. Tenn. Sept. 6, 2013)....................................... 10

*PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997) ............... 25

*Perez v. Wyeth Labs. Inc.*, 734 A.2d 1245 (N.J. 1999) ......................... 23

*PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010) ..................... 25

*PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011)..............................14-15

*Rowe v. Hoffman-La Roche, Inc.*, 917 A.2d 767 (N.J. 2007)............... 19, 23

*Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769 (U.S. 2007)...............................8

*Stromenger v. NPC*, --- F. Supp. 2d ---, 2013 WL 1748357
(D. Or. Apr. 22, 2013)........................................................18, 21, 22, 24

*Talley v. NPC*, No. 08-cv-361-GCM, 2011 WL 2559974
(W.D.N.C. June 28, 2011), *reconsideration denied*,
2011 WL 3515858 (W.D.N.C. Aug. 11, 2011) .........................21, 22, 24

*Tarr v. Bob Ciasulli's Mack Auto Mall, Inc.*, 916 A.2d 484
(N.J. Super. Ct. App. Div. 2007) ......................................................... 19

*Wyman v. Fenton*, Nos. B139640, YC031432, 2001 WL 1203424
(Cal. Ct. App. Oct. 10, 2001)............................................................... 15

*Zimmerman ex rel. Newman v. NPC*, 889 F. Supp. 2d 757 (D. Md. 2012) ............. 19

*Zimmerman v. NPC*, 287 F.R.D. 357, 361 (D. Md. 2012) ..................... 10

**Statutes/Rules**

21 C.F.R. § 310.3(h) ................................................................................... 15

21 U.S.C. § 337(a) ...................................................................................... 25

California Civil Code § 3294 ....................................................................... 18

Federal Rule of Civil Procedure 56 ....................................................... 8, 17

New Jersey Statutes Annotated § 2A:15-5.14b ........................................... 18

New Jersey Statutes Annotated § 2A:58C-1 to -7 ...................................... 19

New Jersey Statutes Annotated § 2A:58C-5c ....................................... 23, 24

## I.    INTRODUCTION

This pharmaceutical products liability lawsuit involves two intravenous bisphosphonate drugs, Aredia® and Zometa®.  These Novartis Pharmaceuticals Corporation ("NPC") drugs have been approved by the Food and Drug Administration ("FDA") to treat cancer patients with various kinds of cancer, including multiple myeloma.  Oncologists have prescribed Zometa® and Aredia® to numerous cancer patients because these drugs are effective at protecting bones from serious skeletal complications of multiple myeloma and other cancers, including potentially crippling or fatal complications like spinal cord compression and pathologic fractures.  *See Patterson v. NPC*, 451 F. App'x 495, 496 (6th Cir. 2011) (Aredia® and Zometa® are prescribed to cancer patients and "are effective at preventing pathologic[] fractures, spinal cord compression, and other bone pains").  According to plaintiff's main expert, Dr. Robert Marx, Aredia® and Zometa® have dramatically extended life, reduced skeletal complications, reduced pain, and thus improved the quality of life of cancer patients.  Zometa® remains on the market as an FDA-approved drug prescribed by oncologists to cancer patients as a standard-of-care drug.  Generic versions of Aredia® – pamidronate – remain on the market as FDA-approved drugs that are sold by companies other than NPC.

Plaintiff Deborah Stanley is a multiple myeloma patient who is alive today after having been diagnosed with an advanced stage of multiple myeloma in 2000.  After receiving that diagnosis, plaintiff received various kinds of treatments, including Aredia® (and/or generic pamidronate) and Zometa®.  She alleges that Aredia® and Zometa® caused her to develop osteonecrosis of the jaw ("ONJ") and that NPC failed to provide adequate warnings regarding the risk of ONJ associated with Aredia® or Zometa®.

As discussed below, NPC is entitled to summary judgment on all of plaintiff's claims because: (A) plaintiff cannot satisfy her proximate cause burden of proof regarding her exposure to Aredia® and Zometa®; (B) she cannot prevail by

focusing on her summer 2009 tooth extractions; (C) she has no admissible evidence to prove specific medical causation; (D) her design defect claim fails as a matter of law; and (E) her claim for breach of implied warranty fails as a matter of law.[1] Moreover, if the Court does not grant summary judgment on all of plaintiff's claims, NPC asks the Court to: (1) preclude plaintiff from seeking to hold NPC liable for certain pamidronate infusions that she cannot prove were Aredia® (as opposed to generic pamidronate); and (2) apply New Jersey law to plaintiff's punitive damages demand and preclude her from seeking punitive damages at trial.

## II.    STATEMENT OF UNCONTROVERTED FACTS

### A.    Aredia® and Zometa®

Aredia® and Zometa® are intravenous bisphosphonate drugs prescribed to cancer patients with hypercalcemia of malignancy, multiple myeloma, or certain other kinds of cancer that has metastasized to bone.  NPC's Statement of Uncontroverted Facts in Support of Motion for Summary Judgment ¶ 1 ("SUF"). Aredia® and Zometa® reduce or delay potentially serious skeletal complications, such as pathologic fractures or pressure on the spinal cord that can result from bone damage from these advanced cancers.  SUF ¶ 1.  According to plaintiff's expert Dr. Marx:  (i) Aredia® and Zometa® have dramatically extended life, reduced skeletal complications, reduced pain, and thus improved the quality of life of patients; and (ii) Aredia® and Zometa® prevent cancer from spreading to bone because, in the presence of these drugs, the malignancy cannot resorb bone into which it can proliferate, SUF ¶¶ 2-3.

The Food and Drug Administration ("FDA") approved Aredia® in 1991 for the treatment of hypercalcemia of malignancy and then approved the drug in 1995 for the treatment of osteolytic bone lesions of multiple myeloma.  SUF ¶¶ 4-5.  The

---

[1] Certain claims have been dismissed: part of Count I of the Complaint (manufacturing defect), Count II (negligent manufacturing), and Count IV (breach of express warranty).  Stipulation of Dismissal of Certain Claims (ECF No. 50).

1   FDA approved Zometa® in 2001 for the treatment of hypercalcemia of malignancy

2   and then approved the drug in February 2002 for the treatment of multiple myeloma

3   and bone metastases from solid tumors.  SUF ¶¶ 6-7.

4       **B.      Osteonecrosis of the Jaw and Subsequent Changes to Aredia® and**

5            **Zometa® Package Inserts**

6       ONJ is a site-specific, osseous pathology that has been reported in the

7   literature since the 19th century.  SUF ¶ 8.  In September 2003, the Journal of Oral

8   and Maxillofacial Surgery published a medical alert by plaintiff's expert Dr. Robert

9   Marx that was the first publication in a scientific journal that addressed an

10  association between bisphosphonate drugs and ONJ.  SUF ¶ 9.  That same month,

11  on September 26, 2003, NPC informed the FDA by letter that NPC was voluntarily

12  revising the Adverse Reactions section of the Aredia® and Zometa® package inserts

13  (also known as "labeling") to provide information about recent reports of ONJ

14  associated with the use of intravenous bisphosphonates.  SUF ¶ 10.  The FDA

15  accepted the revised package insert.  SUF ¶ 11.

16      NPC revised the Aredia® and Zometa® package inserts again in the fall of

17  2004 by adding three paragraphs about ONJ to the Precautions Section.  SUF ¶ 12.

18  In September 2004, NPC sent a "Dear Doctor" letter informing recipients about the

19  new ONJ language on the Aredia® and Zometa® package inserts.  SUF ¶ 13.  NPC

20  sent this letter to thousands of prescribing physicians and also submitted the letter

21  to the FDA, where it was posted on the FDA's publicly accessible MedWatch

22  website on September 30, 2004.  SUF ¶ 13.  An article about the September 2004

23  labeling change was posted on the American Dental Association ("ADA") website

24  in December 2004.  SUF ¶ 14.

25      In May 2005, NPC sent a Dear Dentist letter about Aredia® and Zometa®

26  package insert revisions regarding ONJ to dental care providers throughout the

27  country using an ADA mailing list.  SUF ¶ 15.  The Dear Dentist letter stated that

28  the package inserts recommended avoiding invasive dental procedures, if possible,

for patients treated with bisphosphonates.  SUF ¶ 15.  Plaintiff's expert Dr. Sung, who saw NPC's Dear Dentist letter in May 2005, does not criticize that letter or otherwise criticize the adequacy of NPC's warnings regarding the risk of tooth extractions in bisphosphonate patients.  SUF ¶¶ 16-17.

C.    **Plaintiff's Medical and Dental History, Including Bisphosphonate Therapy**

In March 2000, plaintiff was diagnosed with an advanced stage of multiple myeloma known as plasma cell leukemia.  SUF ¶ 18.  According to Dr. Arturo Molina (plaintiff's oncologist at City of Hope National Medical Center), the median survival for patients with multiple myeloma in 2002 was three to five years and the prognosis for patients with plasma cell leukemia was worse than it was for multiple myeloma patients.  SUF ¶ 19.

Dr. Molina admitted plaintiff to the hospital in March 2000 because she had impending spinal cord compression due to her malignancy.  SUF ¶ 20.  Multiple myeloma patients may experience spinal cord compression, and spinal cord compression can be a life-threatening condition.  SUF ¶ 21.

After plaintiff received chemotherapy and was discharged, she received radiation therapy to her spine.  SUF ¶ 22.  Radiation to bone is one of the skeletal-related events that Aredia® and Zometa® are designed to prevent.  SUF ¶ 23.

In April 2001, a radiology study (CT scan) showed questionable lytic lesions in plaintiff's ribs and vertebras in her spine.  SUF ¶ 24.  In May 2001, Dr. Molina noted that plaintiff had osteoporosis.  SUF ¶ 25.

In June 2001, Dr. Molina started plaintiff on a course of Aredia® therapy.  SUF ¶ 26.  Dr. Molina prescribed Aredia® to plaintiff for her osteoporosis and multiple myeloma – including trying to prevent a recurrence of her multiple myeloma based on literature suggesting that Aredia® has an independent, anti-tumor activity.  SUF ¶ 27.  Plaintiff's course of once-monthly Aredia® infusions continued in 2002 to prevent osteoporosis and skeletal complications of multiple

myeloma.  SUF ¶ 28.  Dr. Molina was not convinced that plaintiff was cured, so he was trying to give her whatever he could to prevent recurrence or complications of her multiple myeloma. SUF ¶ 29.

According to plaintiff, when she first started her Aredia® therapy in June 2001, she did not have any dental problems.  SUF ¶ 30.  Dr. Sung, plaintiff's dental expert witness, has admitted that he does not know, without speculating, what plaintiff's dental condition was in June 2001.  SUF ¶ 31.  Dr. Sung also has conceded that that he has no way of knowing, without speculating, what dental treatment would have been provided to plaintiff if she had had a dental examination in June 2001.  SUF ¶ 32.

In July 2002, Dr. Molina decided that plaintiff's bisphosphonate therapy should be switched from Aredia® to once-monthly Zometa® infusions.  SUF ¶ 33.  Plaintiff received her first Zometa® infusion in August 2002.  SUF ¶ 34.

In October 2002, Dr. Molina left City of Hope National Medical Center.  SUF ¶ 35.  While plaintiff was under Dr. Molina's care, she did not experience any jaw problems.  SUF ¶ 36.  Even if Dr. Molina had known about the potential risk of ONJ when he was treating plaintiff in 2001 and 2002, he nevertheless would have prescribed Aredia® and Zometa® to plaintiff.  SUF ¶ 37.  Plaintiff does not know whether she would have followed Dr. Molina's recommendations to proceed with Aredia® therapy in 2001 and then with Zometa® therapy in 2002, if he had told her that the jaw condition ONJ was a potential side effect of Aredia® or Zometa® therapy.  SUF ¶ 38.

In October 2002, Dr. Ryotaro Nakamura (another City of Hope National Medical Center oncologist) began treating plaintiff.  SUF ¶ 39.  Dr. Nakamura continued plaintiff's course of Zometa® therapy because she had bone lesions and remained at risk for multiple myeloma.  SUF ¶ 40.  Dr. Nakamura continued plaintiff's bisphosphonate therapy in expectation that she would benefit in three ways:  improved bone strength given the prior damage created by her myeloma in

the neck area and elsewhere; potential benefit regarding her osteoporosis; and prevention of new bone problems due to a fear that she could have a recurrence of her myeloma.  SUF ¶ 41.

In February 2005, Dr. Nakamura switched plaintiff from Zometa® to once-monthly pamidronate.  SUF ¶ 42.  He continued to prescribe pamidronate to plaintiff during 2005 and 2006.  SUF ¶ 43.

In January 2007, Dr. Nakamura wrote an office note stating that he and plaintiff "have had multiple discussions about the possible benefits and also side effects of pamidronate."  SUF ¶ 44.  The issues that Dr. Nakamura discussed with plaintiff in early 2007 included the potential side effect of ONJ from pamidronate. SUF ¶ 45.  Dr. Nakamura reduced the frequency of plaintiff's pamidronate infusions to every three months.  SUF ¶ 46.

On June 30, 2007, plaintiff was admitted to the hospital with acute sinusitis and to rule out ONJ.  SUF ¶ 47.  She was discharged from the hospital on July 2, 2007, with a diagnosis of sinusitis, not ONJ.  SUF ¶ 48.  Her pamidronate therapy continued for another year and a half, and she received her last infusion on January 14, 2009.  SUF ¶ 49.

If Dr. Nakamura had known about the potential side effect of ONJ as of 2002 when he started treating plaintiff, he still would have prescribed Zometa® or pamidronate to her.  SUF ¶ 50.  Dr. Nakamura learned about the potential side effect of ONJ in relation to bisphosphonates in late 2004 or early 2005.  SUF ¶ 51. Dr. Nakamura still currently prescribes intravenous bisphosphonates (Zometa® or pamidronate) to his multiple myeloma patients as standard-of-care drugs.  SUF ¶ 52.  After Aredia® went off patent, Dr. Nakamura has not pushed for name brand Aredia® when prescribing the drug to his patients, so it could be either name brand Aredia® or generic pamidronate.  SUF ¶ 53.

In March 2009, plaintiff had tooth pain, was being treated for a dental infection, and was scheduled for a tooth extraction.  SUF ¶ 54.  She discussed the

potential extraction with Dr. Nakamura before her teeth were extracted.  SUF ¶ 55.

Plaintiff began seeing Dr. Carol Calicdan (a dentist) on March 28, 2009.
SUF ¶ 56.  Dr. Calicdan concluded that teeth in plaintiff's mandible (lower
jawbone) needed to be extracted, and that there were no treatment options other
than extraction.  SUF ¶ 57.  Dr. Calicdan needed to extract the teeth to preserve the
health of plaintiff's mouth and avoid potentially fatal complications.  SUF ¶ 58.

In June 2009, plaintiff had another office visit with Dr. Calicdan.  SUF ¶ 59.
During that office visit, Dr. Calicdan reiterated that plaintiff had infections and
abscesses that required extraction of her lower teeth.  SUF ¶ 60.  In June 2009, Dr.
Calicdan extracted three of plaintiff's lower teeth, and the extractions went as
planned, without complications.  SUF ¶ 61.  In August 2009, Dr. Calicdan extracted
the remaining four teeth in plaintiff's lower jaw, and there were no complications at
that time.  SUF ¶ 62.

When Dr. Calicdan extracted plaintiff's teeth in 2009, Dr. Calicdan was not
aware that plaintiff had been treated with bisphosphonate medications.  SUF ¶ 63.
Dr. Calicdan had been aware of the potential association between bisphosphonates
and ONJ since 2006 or 2007.  SUF ¶ 64.

Dr. Sung, plaintiff's dental expert witness, has not offered an opinion in this
case that plaintiff's teeth should not have been extracted.  SUF ¶ 65.  Dr. Sung has
opined that plaintiff's jaw problems that he attributes to plaintiff's bisphosphonate
therapy began in July or August 2009, shortly after the June 2009 extractions.  SUF
¶ 66.  Thus, plaintiff's alleged ONJ developed years after NPC first added ONJ to
the Aredia® and Zometa package inserts in 2003, SUF ¶ 10.  Plaintiff's alleged ONJ
was treated conservatively – *i.e.*, without any surgical procedures.  SUF ¶ 67.

### D.    Generic Pamidronate

In April 2001, the FDA approved generic pamidronate, marketed and sold by
Bedford Laboratories, as a bioequivalent to Aredia®.  SUF ¶ 68.  Subsequently, the
FDA approved additional generic pamidronate products that have been sold by

companies other than NPC since April 2001.  SUF ¶ 69.  After April 2001, Aredia®

sales began to decrease as the Aredia® share of the pamidronate market decreased

with competition from generic pamidronate products.  SUF ¶ 70.  After the FDA

approved generic pamidronate, the Aredia® share of pamidronate market dropped to

7% for 2003, then to 2% for 2004, and then to 1% for 2005 and 2006.  SUF ¶ 71.

## III.   SUMMARY JUDGMENT STANDARD

A district court "shall" grant a summary judgment motion when "there is no

genuine dispute as to any material fact and the movant is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules [of Civil Procedure]."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327,

106 S.Ct. 2548 (1986).  Although the facts and reasonable inferences are construed

in favor of the non-moving party to the extent supportable by the record, *see Scott

v. Harris*, 550 U.S. 372, 378, 381 n.8, 127 S.Ct. 1769 (U.S. 2007), the non-moving

party "cannot defeat summary judgment with allegations in the complaint, or with

unsupported conjecture or conclusory statements," *Hernandez v. Spacelabs Med.

Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  The party opposing summary judgment

"must do more than simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 106 S.Ct. 1348 (1986).  Furthermore, courts must "view the evidence

presented through the prism of the substantive evidentiary burden," *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505 (1986), so the party

opposing summary judgment must present sufficient admissible evidence to show

that a reasonable jury could find for that party, *see id.* at 248 (a dispute about a

material fact is "genuine" if the "evidence is such that a reasonable jury could

return a verdict for the nonmoving party").  "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient" to defeat a

defendant's summary judgment motion.  *Id.* at 252.

1    IV.    ARGUMENT

2          A.    NPC Is Entitled To Summary Judgment On All Claims.

3                1.    Plaintiff cannot satisfy her proximate cause burden of proof

4                      regarding her exposure to Aredia® and Zometa®.

5          Plaintiff's claims in this products liability lawsuit are based on a failure-to-

6    warn theory – namely, that NPC allegedly failed to provide adequate warnings

7    regarding the risk of ONJ associated with Aredia® or Zometa® therapy.  Under

8    California law, it is not enough for plaintiff to establish inadequacy of a warning;

9    she is also required to satisfy her proximate cause burden by proving that the

10   inadequacy in the warning caused her alleged ONJ.  *See Motus v. Pfizer Inc.*, 196 F.

11   Supp. 2d 984, 991 (C.D. Cal. 2001) ("A plaintiff asserting causes of action based

12   on a failure to warn must prove not only that no warning was provided or the

13   warning was inadequate, but also that the inadequacy or absence of the warning

14   caused the plaintiff's injury"), *aff'd* 358 F.3d 659 (9th Cir. 2004).  In cases

15   involving prescription drugs, the learned intermediary doctrine requires

16   pharmaceutical companies to warn physicians, not patients.  *See Carlin v. Superior

17   Court*, 13 Cal. 4th 1104, 1116 (1996); *Motus*, 196 F. Supp. 2d at 990 (quoting

18   *Carlin*).  Thus, the proximate cause analysis focuses on whether a different warning

19   would have changing the prescribing decision of the treating physician.  *See Motus*,

20   196 F. Supp. 2d at 996 ("The burden [is] on the plaintiff to demonstrate that the

21   additional non-disclosed risk was sufficiently high that it would have changed the

22   physician's decision to prescribe the product for the plaintiff." (alteration in

23   original; quotation marks omitted)); *Nix v. SmithKline Beecham Corp.*, No. CV-06-

24   43, 2007 WL 2526402, at *1 (D. Ariz. Sept. 5, 2007) ("Under applicable California

25   law, Plaintiffs must show that additional warnings would have caused [the treating

26   physician] not to prescribe [the drug] for Mr. Nix.").

27          In several other lawsuits involving ONJ allegedly caused by Aredia® and/or

28   Zometa®, plaintiffs' failures to satisfy their proximate cause burden have led to

- 9 -
NPC'S MEMORANDUM ISO SUMMARY JUDGMENT MOTION

1   summary judgment rulings for NPC. *See Payne v. NPC*, No. 1:12-CV-77, --- F.

2   Supp. 2d ---, 2013 WL 4779571, at *6 (E.D. Tenn. Sept. 6, 2013); *D'Agnese v.*

3   *NPC*, No. CV-12-00749, --- F. Supp. 2d ---, 2013 WL 3335203, at *9-10 (D. Ariz.

4   July 2, 2013); *Ingram v. NPC*, 888 F. Supp. 2d 1241, 1245-47 (W.D. Okla. 2012);

5   *Zimmerman v. NPC*, 287 F.R.D. 357, 361 (D. Md. 2012); *Eberhart v. NPC*, 867 F.

6   Supp. 2d 1241, 1254 (N.D. Ga. 2011).

7           Likewise, in this case, plaintiff cannot satisfy her proximate cause burden

8   because, even though her oncologists were not aware of the risk of ONJ associated

9   with Aredia® or Zometa® when they started prescribing those drugs to plaintiff,

10  both oncologists admitted that they still would have prescribed the drugs to her

11  anyway, even if they had known about ONJ at the time.  Even if Dr. Molina had

12  known about the potential risk of ONJ when he was treating plaintiff in 2001 and

13  2002, he nevertheless would have prescribed Aredia® and Zometa® to plaintiff.

14  SUF ¶ 37.  Dr. Nakamura admitted that, if he had known about the potential side

15  effect of ONJ as of 2002 when he started treating plaintiff, he still would have

16  prescribed Zometa® or pamidronate to her.  SUF ¶ 50.  In fact, Dr. Nakamura still

17  currently prescribes intravenous bisphosphonates (Zometa® or pamidronate) to his

18  multiple myeloma patients as standard-of-care drugs.  SUF ¶ 52.[2]

19          Although plaintiff may rely on a summary judgment denial by Judge Otero in

20  another Aredia®/Zometa® lawsuit, *see Georges v. NPC*, No. CV 06-5207 SJO

21  (VBKx), 2012 WL 9083365 (C.D. Cal. Nov. 2, 2012), that ruling is not persuasive

22  authority regarding this proximate cause issue.  The *Georges* ruling is based on a

23  _____

24  [2] NPC makes this proximate cause argument without conceding that there was any
    duty or requirement to warn physicians regarding a potential association between

25  Aredia® or Zometa® therapy and ONJ before September 2003 – when Dr. Marx 's
    initial case report regarding ONJ was published in the Journal of Oral and

26  Maxillofacial Surgery and when NPC made its first revision to the Aredia® and
    Zometa® package inserts to inform physicians about ONJ. *See* SUF §§ 9-11.  This

27  proximate cause argument presents a different issue that is separate from the issue
    of whether NPC should have provided earlier or different warnings about reports of

28  ONJ occurring in bisphosphonate patients.

1  significant misinterpretation of *Ingram*, 888 F. Supp. 2d at 1245-47, which granted

2  summary judgment for NPC because plaintiff did not demonstrate "that any of the

3  changed prescribing practices described by [the physician who prescribed

4  bisphosphonates to Mr. Ingram] ***would have prevented*** Mr. Ingram's injury," *id.* at

5  1246 (emphasis added); *see also id.* at 1246 (holding that plaintiff failed to

6  demonstrate "how the changed practices ***would have prevented*** injury to Mr.

7  Ingram or how his injury ***would have been avoided*** had the new prescribing

8  practices identified by [the prescribing physician] been implemented in Mr.

9  Ingram's case" (emphasis added)).  Disregarding the *Ingram* court's repeated use of

10 a definitive, appropriate standard ***(would have)***, the *Georges* ruling asserts that the

11 *Ingram* court applied a standard whereby a plaintiff can avoid summary judgment

12 by demonstrating changes in prescribing practices "if such changes ***may have***

13 ***prevented*** [plaintiff's] injury."  *Georges*, 2012 WL 9083365, at *5 (emphasis

14 added).  However, this kind of speculation and conjecture are not appropriate for

15 this proximate cause analysis.  *See Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d

16 396, 402 (1985) (if "speculation or conjecture" is required to prove "proximate

17 cause then the granting of nonsuit is proper").  This Court should follow the *Ingram*

18 standard – not the *Georges* standard – because the *Ingram* standard comports with

19 the appropriate summary judgment analysis.  *See Matsushita Elec. Indus.*, 475 U.S.

20 at 586 (party opposing summary judgment "must do more than simply show that

21 there is some metaphysical doubt as to the material facts"); *Hernandez*, 343 F.3d at

22 1112 (party cannot oppose summary judgment "with unsupported conjecture or

23 conclusory statements").  If the correct standard is applied, plaintiff has no way to

24 satisfy her proximate cause burden of proving that she would not have been treated

25 with Aredia® and Zometa® if her prescribing physicians had received earlier or

26 different warnings about ONJ being a possible side effect of those drugs.

27     Moreover, although some plaintiffs in the Aredia®/Zometa® litigation

28 contend that their alleged ONJ would have been prevented if they had been told to

- 11 -

have a dental evaluation before starting Aredia® or Zometa® therapy, plaintiff cannot make that argument in this case.  She has admitted that she did not have any dental problems when she first started her Aredia® therapy in June 2001, SUF ¶ 30, so there is no basis for her to contend that a pre-bisphosphonate-treatment dental evaluation would have changed her bisphosphonate treatment.  Plaintiff's expert witness, Dr. Sung, admits that he does not know, without speculating, what plaintiff's dental condition was in June 2001, SUF ¶ 31, or what dental treatment would have been provided to her if she had had a dental examination in June 2001, SUF ¶ 32.  The absence of proof regarding this issue precludes plaintiff from claiming that a pre-bisphosphonate-treatment dental evaluation would have prevented her alleged ONJ.

### 2.   Plaintiff cannot prevail by focusing on the tooth extractions that occurred in the summer of 2009.

In an attempt to avoid summary judgment, plaintiff may focus on the June and August 2009 tooth extractions.  But that argument fails for two reasons.

*First*, by the summer of 2009 – well over five years after Dr. Marx had published his initial case report in September 2003 in the Journal of Oral and Maxillofacial Surgery – the potential association between bisphosphonate therapy and ONJ was widely known.  By that point, NPC had revised the Aredia® and Zometa® package inserts to provide warnings about ONJ – including the recommendation to avoid invasive dental procedures (such as tooth extractions) if possible in bisphosphonate patients – and had sent the September 2004 Dear Doctor letter and the May 2005 Dear Dentist letter.  SUF ¶¶ 10-15.  Plaintiff's oncologist, Dr. Nakamura, learned about the potential side effect of ONJ in relation to bisphosphonates in late 2004 or early 2005.  SUF ¶ 51.  Dr. Calicdan was aware of the potential association between bisphosphonates and ONJ since 2006 or 2007.  SUF ¶ 64.  The exact dates when these treating health care providers learned about this issue are immaterial for purposes of this motion because it is undisputed that

1   they learned about this issue well before plaintiff had her tooth extractions in 2009.

2   In these circumstances, plaintiff has no basis to contend that NPC's warnings

3   regarding the risk of tooth extractions in patients treated with Aredia® or Zometa®

4   were inadequate.  Dr. Sung, who saw NPC's Dear Dentist letter in May 2005, SUF

5   ¶ 16, does not criticize that letter or otherwise opine that NPC's warnings regarding

6   the risk of tooth extractions in bisphosphonate patients were inadequate, SUF ¶ 17.

7   Plaintiff has the burden of proving that NPC's warnings were inadequate as to this

8   issue, *see Motus*, 196 F. Supp. 2d at 991 (plaintiff must prove "that no warning was

9   provided or the warning was inadequate"), but she cannot satisfy that burden.

10        *Second*, even if plaintiff were able to establish that NPC's warnings

11   regarding dental extractions were inadequate, plaintiff cannot satisfy her proximate

12   cause burden of proving that a different warning would have avoided the

13   extractions and thereby prevented her alleged ONJ.  *See supra* pages 9-10 (citing

14   proximate cause case law).  Dr. Calicdan concluded that the teeth needed to be

15   extracted to avoid potentially fatal complications, and that there were no treatment

16   options other than extraction.  SUF ¶¶ 57-58.  Moreover, Dr. Sung has not opined

17   that plaintiff's teeth should not have been extracted.  SUF ¶ 65.  Plaintiff has no

18   evidence to rebut Dr. Calicdan's conclusion that plaintiff's teeth needed to be

19   extracted in the summer of 2009 and that there were no other treatment options.

20   Thus, plaintiff cannot satisfy her proximate cause burden regarding this issue.

21        **3.      Plaintiff's claims fail because she has no admissible evidence**

22               **to prove specific medical causation.**

23        Medical causation (*i.e.*, that Aredia® and/or Zometa® caused plaintiff's

24   alleged ONJ) is an essential element of all of plaintiff's claims.  *See Jones*, 163 Cal.

25   App. 3d at 402-03; *Messick v. NPC*, 924 F. Supp. 2d 1099, 1107-08 (N.D. Cal.

26   2013); *see also In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp.

27   2d 879, 890, 922 (C.D. Cal. 2004); *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380,

28   1382 (N.D. Cal. 1995).  In a pharmaceutical products liability case like this one,

1   medical causation is a complex issue that is beyond the knowledge of lay jurors.

2   Thus, plaintiff must prove specific causation through expert testimony.  *See*, *e.g.*,

3   *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1334 n.4 (11th Cir. 2010).

4          NPC is entitled to judgment as a matter of law because the Court should

5   exclude the specific causation opinions of plaintiff's only retained expert witness

6   who addresses specific causation (Dr. Sung) and any specific causation opinions of

7   the treating health care providers designated by plaintiff as non-retained experts.

8   *See* NPC's Motion to Exclude Testimony of Plaintiff's Case-Specific Experts (filed

9   this same date).  These are the only experts designated by plaintiff to address

10  specific causation.  Without any specific causation opinions from these witnesses,

11  plaintiff lacks the expert testimony required to satisfy her burden of proving

12  specific causation.  Therefore, NPC is entitled to summary judgment on all claims.

13  *See Messick*, 924 F. Supp. 2d at 1108 (granting summary judgment based on

14  exclusion of experts' specific causation opinions); *In re Silicone Gel Breast*

15  *Implants*, 318 F. Supp. 2d at 922 (same); *Casey*, 877 F. Supp. at 1386 (same).

16          **4.      Plaintiff's design defect claim fails as a matter of law.**

17          Plaintiff's strict liability claim (Count I) includes an allegation that NPC is

18  liable on a design defect theory.  However, this claim fails as a matter of law

19  because California does not recognize a strict liability defective design claim for

20  prescription drugs.  "[D]rug manufacturers [can] not be held strictly liable for

21  design defects in prescription drugs."  *Artiglio v. Superior Court*, 22 Cal. App. 4th

22  1388, 1393 (1994) (citing *Brown v. Superior Court*, 44 Cal. 3d 1049, 1072 (1988)).[3]

23  _____

24  [3] Moreover, even if plaintiff had a viable design defect claim under state law, the
    United States Supreme Court has now made clear that state law claims that a drug

25  should have been designed differently are precluded by federal law because, "[i]n
    the drug context, either increasing the 'usefulness' of a product or reducing its 'risk

26  of danger' would require redesigning the drug," which federal law prohibits absent
    prior FDA approval of the new design. *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct.

27  2466, 2475 (2013); *id.* at 2471 (prohibition on changing drug design in any way
    that may affect risk-benefit profile without prior FDA approval applies "whether

28  generic or brand-name" drug is at issue); *id.* (FDA determines that "the drug's
    'probable therapeutic benefits . . . outweigh its risk of harm'"); *PLIVA, Inc. v.*

- 14 -

5.      **Plaintiff's breach of implied warranty claim fails as a matter of law.**

The Complaint (Count V) alleges a claim for breach of implied warranty but that claim fails as a matter of law because "[p]rivity of contract is a prerequisite in California for recovery on a theory of breach of implied warranties of fitness and merchantability." *Blanco v. Baxter Healthcare Corp.*, 158 Cal. App. 4th 1039, 1058 (2008) (quotation marks omitted); *see also Kennedy v. Baxter Healthcare Corp.*, 43 Cal. App. 4th 799, 810-11 (1996) (to recover on an implied warranty claim, "plaintiffs must stand in vertical privity with the defendants" (quotation marks omitted)).  In *Blanco*, an implied warranty claim against the manufacturer of a heart valve, which "was available only pursuant to a licensed physician's prescription," 158 Cal. App. 4th at 1044, failed as a matter of law because there was no privity between the decedent and the manufacturer, *id*. at 1059.  Other courts also have held that privity is required for implied warranty claims under California law and have disposed of such claims for lack of privity in cases involving pharmaceuticals or other medical products that have been introduced into a patient's body.[4]

---

*Mensing*, 131 S. Ct. 2567, 2581 (2011) ("[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes.").  The Supreme Court further concluded that 21 C.F.R. § 310.3(h) "give[s] examples of when the FDA considered a drug to be new" such that it "would require its own NDA [New Drug Application]." *Bartlett*, 133 S. Ct. at 2475. Among those examples are changes to the "dosage" or "duration of administration." § 310.3(h).

[4] *See Evraets v. Intermedics Intraocular, Inc.*, 29 Cal. App. 4th 779, 788 (1994); *Wyman v. Fenton*, Nos. B139640, YC031432, 2001 WL 1203424, at *2 (Cal. Ct. App. Oct. 10, 2001) (implied warranty claim against pharmaceutical companies alleging that their corticosteroids caused avascular necrosis failed due to lack of privity); *McCarty v. Johnson & Johnson*, No. 1:10-CV-00350, 2010 WL 2629913, at *6 (E.D. Cal. June 29, 2010); *Adams v. I-Flow Corp.*, No. CV09-09550 R(SSx), 2010 WL 1339948, at *4 (C.D. Cal. Mar. 30, 2010); *Morton v. Centerpulse Orthopedics, Inc.*, No. CIV S032602GEBGGH, 2005 WL 1366494, at *4 (E.D. Cal. May 10, 2005); *Chandler v. Chiron Corp.*, No. C-96-1047 SI, 1997 WL 464827, at *7-8 (N.D. Cal. July 28, 1997).

In this case, plaintiff did not purchase her Aredia® or Zometa® infusions directly from NPC.  She received those infusions from her oncologists based on their prescribing decisions.  There is no evidence that plaintiff was in privity with NPC.  Therefore, based on the case law cited above, NPC is entitled to summary judgment on her claim for breach of implied warranty.

**B.     If The Court Does Not Grant Summary Judgment On All Claims, The Court Should Preclude Plaintiff From Seeking To Hold NPC Liable For Certain Pamidronate Infusions That She Cannot Prove Were Aredia®, As Opposed To Generic Pamidronate.**

The California Supreme Court recently re-affirmed a "bedrock principle in strict liability law" – namely, that "the plaintiff's injuries must have been caused by a 'defect' in the [defendant's] product."  *O'Neill v. Crane*, 53 Cal 4th 335, 347 (2012) (quotation marks omitted).  Therefore, "[t]hat the defendant manufactured, sold, or supplied the injury causing product is a separate and threshold requirement that must be independently established."  *Id*. at 363.  The court also held that defendants in that case "had no duty to warn of risks arising from *other manufacturers'* products."  *Id*. at 348.  The court also applied the product identification principles to plaintiff's negligence claims.  *Id*. at 366 ("The same policy considerations that militate against imposing strict liability in this situation apply with equal force in the context of negligence.").

Here, if this Court does not grant summary judgment on all claims, the Court should preclude plaintiff from seeking to hold NPC liable for certain pamidronate infusions because she cannot satisfy her product identification burden of proving that the infusions were name brand Aredia® sold by NPC, as opposed to another company's generic pamidronate.  In February 2005, Dr. Nakamura switched plaintiff from Zometa® to pamidronate, and she received pamidronate until January 2009.  SUF ¶¶ 42-43, 49.  Plaintiff presumably will contend that these were name brand Aredia® infusions but she has no evidence to prove that contention.  In fact, it

is highly unlikely that she received any Aredia® infusions during that period because Aredia® went off patent in April 2001, so generic pamidronate products entered the market, SUF ¶¶ 68-69.  Due to competition from generic pamidronate products, Aredia® had only one percent of the pamidronate market by 2005, SUF ¶ 71.  Moreover, Dr. Nakamura's records do not shed light on whether plaintiff received Aredia® or generic pamidronate infusions because, after Aredia® went off patent, Dr. Nakamura has not pushed for Aredia® when prescribing the drug to his patients, so it could be either name brand Aredia® or generic pamidronate.  SUF ¶ 53.  Therefore, the Court should hold that plaintiff cannot satisfy her product identification burden for the pamidronate infusions that she received from 2005 to 2009.  *See In re Aredia and Zometa Prods. Liab. Litig*, No. 3:06-MD-1760, 2007 WL 4387376 (M.D. Tenn. Nov. 30, 2007) (granting summary judgment for NPC because plaintiff failed to prove that she was treated with Aredia® as opposed to generic pamidronate).

> **C.   If The Court Does Not Grant Summary Judgment On All Claims, The Court Should Apply New Jersey Law To Plaintiff's Punitive Damages Demand And Preclude Her From Seeking Punitive Damages At Trial.**

If the Court does not grant summary judgment on all claims, the Court should apply New Jersey law to plaintiff's punitive damages demand and preclude plaintiff from seeking punitive damages at trial.[5]

> **1.   California and New Jersey law conflict regarding punitive damages.**

NPC has its corporate headquarters (principal place of business) in New Jersey, *see* Compl. ¶ 3, and plaintiff is a California citizen and resident, *id*. ¶ 2.  The

---

[5] Although Rule 56 addresses claims or defenses – not damages demands – NPC nevertheless presents this argument here out of an abundance of caution (in case this Court prefers that this argument not be made in a separate motion).

1  parties agree that California substantive law applies to plaintiff's underlying causes

2  of action but disagree regarding whether California law or New Jersey law governs

3  plaintiff's punitive damages demand.

4       To resolve this dispute, this Court is required to: (a) apply California's choice

5  of law rules, *see*, *e.g.*, *Love v. Associated Papers, Ltd.*, 611 F.3d 601, 610 (9th Cir.

6  2010); and (b) "conduct a separate choice of law analysis with respect to each issue

7  in a case," *Bank Saderat Iran v. Telegen Corp.*, 30 F. App'x 741, 743 (9th Cir.

8  2002); *see McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 87-88 (2010) (when

9  conducting choice of law analysis, courts are required to determine "whether the

10  relevant law of each of the potentially affected jurisdictions **with regard to the**

11  **particular issue in question** is the same or different" (emphasis added)).[6]

12       The initial steps in California's "governmental interest" analysis for choice of

13  law rulings require the Court to determine whether each state's relevant law with

14  respect to the particular issue is different and, if so, whether there is a "true

15  conflict" based on "each jurisdiction's interest in the application of its own law

16  under the circumstances of the particular case." *McCann*, 48 Cal. 4th 68, 87-88

17  (2010).  Here, there are important differences between California and New Jersey

18  punitive damages law.  For example, California has no statutory cap on punitive

19  damages, *see* Cal. Civ. Code § 3294; *Hernandez v. Aeronaves De Mexico, S.A.*, 583

20  F. Supp. 331, 334 (N.D. Cal. 1984), but New Jersey has a statutory cap – namely,

21  the greater of $350,000 or five times the compensatory damages award, *see* N.J.

22  Stat. Ann. § 2A:15-5.14b; *Stromenger v. NPC*, --- F. Supp. 2d ---, 2013 WL

23  1748357, at *5 (D. Or. Apr. 22, 2013) (citing § 2A:15-5.14b; applying New Jersey

24  punitive damages law in Zometa® lawsuit); *Zimmerman ex rel. Newman v. NPC*,

---

[6] Thus, one jurisdiction's body of law can govern punitive damages, even though
another jurisdiction's law governs liability for compensatory damages. *See, e.g.*,
*Franklin Supply Co. v. Tolman*, 454 F.2d 1059, 1075-76 (9th Cir. 1971) (applying
California choice of law analysis and holding that Venezuela law applied to
punitive damages demand even though Colorado law governed underlying
substantive claim).

1   889 F. Supp. 2d 757, 760 (D. Md. 2012) (same). The two states' laws also conflict

2   regarding the circumstances in which punitive damages are – or are not – available

3   in lawsuits for personal injuries allegedly caused by FDA-approved drugs.

4   California has no restriction on plaintiffs recovering punitive damages in such

5   lawsuits.  However, New Jersey law shields pharmaceutical companies from

6   punitive damages in drug products liability lawsuits "if the drug at issue was

7   approved by the FDA," *Zimmerman*, 889 F. Supp. 2d at 760, unless the plaintiff

8   establishes that "'the manufacturer knowingly withheld or misrepresented

9   information required to be submitted under the agency's regulations, which

10  information was material and relevant to the harm in question,'" *id.* (quoting N.J.

11  Stat. Ann. § 2A:58C-5(c)).

12          Moreover, there is a true conflict here between New Jersey and California

13  law because each state has an interest in applying its punitive damages law in this

14  case.  As part of tort reform efforts, the New Jersey legislature changed New Jersey

15  law to limit liability in certain circumstances.  In 1987, the New Jersey legislature

16  enacted "the New Jersey Products Liability Act (NJPLA), *N.J.S.A.* 2A:58C-1 to -7,

17  in order to re-balance the law in favor of manufacturers," *Rowe v. Hoffman-La*

18  *Roche, Inc.*, 917 A.2d 767, 772 (N.J. 2007) (quotation marks omitted), and "limit[]

19  the liability of manufacturers of FDA-approved products by reducing the burden

20  placed on them by product liability litigation," *id.* at 774.  As the New Jersey

21  Supreme Court explained, the "[l]egislature carefully balanced the need to protect

22  individuals against the need to protect an industry with a significant relationship to

23  [the New Jersey] economy and public health."  *Id.*  Likewise, the New Jersey

24  legislature pursued a significant governmental interest in 1995 when it enacted the

25  New Jersey Punitive Damages Act which caps punitive damages awards.  *See Tarr*

26  *v. Bob Ciasulli's Mack Auto Mall, Inc.*, 916 A.2d 484, 488-89 (N.J. Super. Ct. App.

27  Div. 2007).  This legislation was enacted "to establish more restrictive standards

28  with regard to the awarding of punitive damages" and "to limit the use and amount

1  of punitive damages which may be awarded in a lawsuit." *Id.* at 489.  By contrast,

2  California has not enacted a statutory cap on punitive damages and has not

3  restricted the availability of punitive damages when plaintiffs sue pharmaceutical

4  companies for injuries allegedly caused by FDA-approved drugs.  Thus, the

5  interests of New Jersey and California conflict regarding this issue.

6          **2.     New Jersey has a greater interest than California in having**

7               **its punitive damages law applied in this case.**

8          The final step in California's choice of law analysis requires the Court to

9  "evaluate and compare the nature and strength of each jurisdiction's interest in the

10  application of its own law to determine which state's interest would be more

11  impaired if its policy were subordinated to the policy of the other state." *McCann*,

12  48 Cal. 4th at 96-97 (internal quotation marks and brackets omitted).  This Court's

13  task is not to determine whether New Jersey or California punitive damages law "is

14  the better or worthier [approach], but rather to decide – in light of the legal question

15  at issue and the relevant state interests at stake – which jurisdiction should be

16  allocated the predominating lawmaking power under the circumstances of the

17  present case." *Id.*

18          In this case, the Court should allocate the predominating lawmaking power to

19  New Jersey because that state has the greatest interest in whether punitive damages

20  are awarded here, given that:  (a) NPC is headquartered in New Jersey; (b) the

21  alleged conduct that gives rise to plaintiff's punitive damages demand occurred – if

22  it did occur – at NPC's New Jersey headquarters; and (c) New Jersey has a strong

23  policy of limiting punitive damages in products liability lawsuits involving FDA-

24  approved drugs.  This conclusion is supported by numerous rulings in the

25  Aredia®/Zometa® litigation, where courts repeatedly have applied New Jersey

26  punitive damages law to claims asserted by non-New-Jersey residents for ONJ

27  allegedly caused by infusions of Aredia® and/or Zometa® that occurred outside

28  New Jersey.  *See Dopson-Troutt v. NPC*, No. 8:06-CV-1708-T-24-EAJ, 2013 WL

3808205, at *2-5 (M.D. Fla. July 22, 2013); *Stromenger*, 2013 WL 1748357, at *5-10; *Guenther v. NPC*, No. 6:08-cv-00456-Orl-31DAB, 2013 WL 1225391, at *2-4 (M.D. Fla. Mar. 27, 2013); *Krause v. NPC*, 926 F. Supp. 2d 1306, 1310-12 (N.D. Fla. 2013); *Zimmerman*, 889 F. Supp. 2d at 762-64; *Brown v. NPC*, No. 7:08-cv-00130-FL, 2012 WL 3066588, at *4-9 (E.D.N.C. July 27, 2012); *Irby v. NPC*, No. MID-L-1815-08 MT 278, 2011 WL 5835414 (N.J. Super. Ct. Nov. 18, 2011); *Talley v. NPC*, No. 08-cv-361-GCM, 2011 WL 2559974, *3-5 (W.D.N.C. June 28, 2011), *reconsideration denied*, 2011 WL 3515858 (W.D.N.C. Aug. 11, 2011); *Deutsch v. NPC*, 723 F. Supp. 2d 521, 524-26 (E.D.N.Y. 2010); *Meng v. NPC*, Nos. L7670-07MT, L-6072-08MT, 2009 WL 4623715 (N.J. Super. Ct. Law Div. Nov. 23, 2009).[7]  NPC's request that the Court apply New Jersey punitive damages law in this case is also supported by rulings in other lawsuits where courts have applied California's governmental interest analysis to determine which jurisdiction's law governs the issue of punitive damages.[8]

In this case, like in the Aredia®/Zometa® rulings cited above, plaintiff's allegations are based on conduct by NPC that – if it did occur – was based in or originated from NPC's corporate headquarters in New Jersey.  For example, the Complaint repeatedly alleges that NPC failed to provide adequate warnings about the risk of ONJ associated with Aredia® or Zometa®.  *See* Compl. ¶¶ 13, 15, 25, 36-37, 41.  Thus, as in other Aredia® or Zometa® cases, plaintiff's claims are based on corporate decisions regarding drug labeling that occurred in New Jersey.  *See, e.g.*,

---

[7] Although these rulings from other Aredia®/Zometa® lawsuits were based on different choice-of-law analyses than California's governmental interest analysis, these rulings are persuasive authority for this Court to consider when deciding the punitive-damages-choice-of-law issue presented in this case.

[8] *See Franklin Supply Co.*, 454 F.2d at 1076 (Ninth Circuit ruling that Venezuela law, not Colorado law, applied to plaintiff's punitive damages request); *In re Air Crash Disaster Near Chi., Ill. on May 25, 1979*, 644 F.2d 594, 621 (7th Cir. 1981) "both the principal place of business and the place of the alleged misconduct have strong interests" and should govern when they are within the same state); *see also McNall v. Tatham*, 676 F. Supp. 987, 993-94 (C.D. Cal. 1987); *Hernandez*, 583 F. Supp. at 333-34.

*Krause*, 926 F. Supp. 2d at 1310; *Zimmerman*, 889 F. Supp. 2d at 763; *Talley*, 2011 WL 2559974, at *4; *Deutsch*, 723 F. Supp. 2d at 525-26.  The relevant conduct for purposes of plaintiff's punitive damages demand occurred in New Jersey.  *See*, *e.g.*, *Stromenger*, 2013 WL 1748357, at *9; *Krause*, 926 F. Supp. 2d at 1310.  Therefore, New Jersey has a strong interest in having its punitive damages law applied in this case.  *See Krause*, 926 F. Supp. 2d at 1311 ("Plainly, New Jersey has the greater interest in regulating the conduct of a New Jersey business.").

Moreover, California's interest in this issue is comparatively weak because the place of the injury in this case is "fortuitous."  *See*, *e.g.*, *Stromenger*, 2013 WL 1748357, at *9; *Krause*, 926 F. Supp. 2d at 1310; *Zimmerman*, 889 F. Supp. 2d at 762.  Patients throughout the country have been treated with Aredia® and Zometa®, so the alleged conduct giving rise to plaintiff's punitive damages demand could have caused injury in any state.  There is no allegation or evidence that NPC somehow "targeted" its allegedly culpable conduct at California residents or the State of California.  California has no greater interest in applying its punitive damages laws to this case than any other state where patients have received Aredia® or Zometa® therapy.  New Jersey's strong interest in legislation that it enacted specifically to protect pharmaceutical companies from punitive damages in lawsuits involving FDA-approved drugs would suffer much greater impairment than California's interest in applying its punitive damages law.  This Court should join the long string of other courts that have applied New Jersey punitive damages law in the Aredia®/Zometa® litigation.

NPC expects that plaintiffs will focus on the denial of NPC's punitive-damages-choice-of-law motion in *Hill v. NPC*, No. 1:06-cv-00939-AWI-DLD, 2012 WL 967577 (E.D. Cal. Mar. 21, 2012), but that ruling is not persuasive authority for the issues presented here.  The ruling unduly minimizes the interests of New Jersey in having its punitive damages law applied to Aredia®/Zometa® lawsuits and inflates California's interest in having its punitive damages law

applied.  For example, by focusing on NPC's alleged failure to communicate Zometa® risk information to doctors and patients in California, *id*. at *7, the court overlooked the fact that – as numerous other courts in the Aredia®/Zometa® litigation have acknowledged – the decisions regarding the content of NPC's Zometa® warning occurred at NPC's headquarters ***in New Jersey***.  Moreover, the same Zometa® warnings information was communicated to prescribing physicians in other states throughout the country, so there is no basis to conclude that NPC singled out California as a target for allegedly improper conduct.  The *Hill* ruling also seems to ignore the fact that NPC and the prescription drugs at issue here are closely regulated by the FDA.  California's interest in the issues presented in this case cannot be compared, as the *Hill* court did, to "California's regulatory interest" in "prevent[ing] tavern keepers from selling alcoholic beverages to obviously intoxicated persons who are likely to act in California in the intoxicated state."  *Id*. at *10.  This Court should not follow the *Hill* ruling and should instead apply New Jersey punitive damages law in this case.

### 3.    If New Jersey punitive damages law applies here, then plaintiff's punitive damages demand is barred by preemption principles.

The New Jersey Products Liability Act ("NJPLA") generally precludes punitive damages when a "drug or device" that is alleged to have "caused the claimant's harm was subject to premarket approval . . . by the federal Food and Drug Administration . . . and was approved ."  N.J. Stat. Ann. § 2A:58C-5c.  As the New Jersey Supreme Court has explained, "FDA approval of prescription drugs conclusively prohibits an award of punitive damages in products liability actions." *Rowe v. Hoffman-La Roche, Inc.*, 917 A.2d 767, 774 (N.J. 2007); *see Perez v. Wyeth Labs. Inc.*, 734 A.2d 1245, 1259 (N.J. 1999) (stating that legislature prohibited punitive damages in cases involving sale of pharmaceutical products where manufacturer complied with FDA regulations).

The NJPLA contains one exception to this prohibition against punitive damages:  "[W]here the product manufacturer knowingly withheld or misrepresented information required to be submitted under the agency's regulations, which information was material and relevant to the harm in question, punitive damages may be awarded."  N.J. Stat. Ann. § 2A:58C-5c.  In *McDarby v. Merck & Co.*, 949 A.2d 223 (N.J. Super. Ct. App. Div. 2008), *appeal dismissed as improvidently granted*, 979 A.2d 766 (2009), the New Jersey Appellate Division held that this exception was preempted by federal law "[b]ecause the punitive damages provisions of N.J.S.A. 2A:58C-5c impinge upon federal statute[s] and regulation[s] to the same extent that was recognized" by the United States Supreme Court in *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).  *See McDarby*, 949 A.2d at 276; *see also Cornett v. Johnson & Johnson*, 998 A.2d 543, 566-67 (N.J. Super. Ct. App. Div. 2010) (holding that punitive damages demand was preempted under *Buckman*), *aff'd*, 48 A.3d 1041 (N.J. 2012).

In the Aredia®/Zometa® litigation, courts repeatedly have held that the so-called "fraud on the FDA" exception to New Jersey's prohibition on punitive damages in cases involving FDA-approved drugs is preempted based on the principles discussed above.  *See Dopson-Troutt*, 2013 WL 3808205, at *4-5; *Stromenger*, 2013 WL 1748357, at *10-13; *Guenther*, 2013 WL 1225391, at *3-4; *Zimmerman*, 889 F. Supp. 2d at 762; *Brown v. NPC*, No. 7:08-CV-00130-FL, 2011 WL 6318987, at *4 (E.D.N.C. Dec. 16, 2011); *Talley*, 2011 WL 2559974, at *5; *Bessemer v. NPC*, No. MID-L-1835-08, 2010 WL 6257855 (N.J. Super. Ct., Law Div. Apr. 30, 2010); *Meng*, 2009 WL 4623715.

These preemption rulings are consistent with the Ninth Circuit's approach to *Buckman* preemption.  *See Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1206-07 (9th Cir. 2002) (applying *Buckman* preemption and holding that allowing state law claims of fraud on EPA would impede that federal agency's ability to carry out its statutory objectives); *see also Kobar ex rel. Kobar v. Novartis Corp.*,

378 F. Supp. 2d 1166, 1175-76 (D. Ariz. 2005) (applying *Buckman* preemption to fraud-on-the-FDA provision in Arizona's punitive damages statute and holding that plaintiffs would be precluded from pursuing punitive damages at trial unless FDA itself had found that pharmaceutical company defendant withheld material information required to be submitted under its regulations). Given that the FDA has **not** made a fraud-on-the-FDA finding regarding Aredia® or Zometa®, *see In re Aredia and Zometa Prods. Liab. Litig*, 352 F. App'x 994, 995 (6th Cir. 2009), plaintiff is precluded from pursuing punitive damages against NPC in this case.[9]

## V.   CONCLUSION

For the foregoing reasons, the Court should grant this motion and enter summary judgment in favor of NPC.

DATED:  November 18, 2013          Respectfully submitted,

                                   PARKER MILLIKEN CLARK O'HARA &
                                   SAMUELIAN, P.C.

                                   By:  /s/ *Brent G. Cheney*
                                        BRENT G. CHENEY

                                   Attorneys for defendant, NOVARTIS
                                   PHARMACEUTICALS CORPORATION

_____

[9] Even if the New Jersey fraud-on-the-FDA statutory provision were not preempted, plaintiff would be precluded from seeking punitive damages under the New Jersey statute because private litigants lack standing to enforce alleged violations of FDA regulations. The Federal Food, Drug, and Cosmetic Act ("FDCA") provides that all "proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States," 21 U.S.C. § 337(a). This provision precludes "litigation of the alleged underlying FDCA violation in the circumstance where the FDA has not itself concluded that there was such a violation." *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010); *see also Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 131 S. Ct. 1342, 1343 (2011) (a common law claim requiring proof of a statutory violation "is in essence a suit to enforce the statute itself" and cannot be asserted by a private litigant); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997) (no private right of action exists to enforce violations of the FDCA).